318 P.3d 419

Katrina Perkins STEINBERGER, as Executor of the Estate of Charles A. Perkins, deceased, and individually, Petitioner,

v.

The Honorable Michael R. McVEY, Judge of the Superior Court of the State of Arizona, in and for the County of MARICOPA, Respondent Judge,

Indymac Mortgage Services, a division of Onewest Bank, F.S.B., a Federally Chartered Savings Bank; Deutsche Bank National Trust Company, as Trustee of the Indymac Indx Mortgage Loan Trust 2005–AR14; Mortgage Electronic Registration Systems, Inc., a Delaware Corporation; Quality Loan Service Corporation, a California Corporation, Real Parties in Interest.

No. 1 CA–SA 12–0087.

Court of Appeals of Arizona, Division 1.

Jan. 30, 2014.

Barbara J. Forde, PLC, Scottsdale, By Barbara J. Forde, Counsel for Petitioner.

Quarles & Brady, LLP, By John Maston O'Neal, Krystal M. Aspey, Phoenix, Counsel for Real Parties in Interest.

Judge ANDREW W. GOULD delivered the opinion of the Court, in which Presiding Judge JOHN C. GEMMILL and Judge PETER B. SWANN joined.

## OPINION

GOULD, Judge.

¶ 1 Petitioner Katrina Perkins Steinberger ("Steinberger") seeks special action relief from the trial court's judgment granting a motion to dismiss filed by OneWest Bank, FSB ("OneWest"), Deutsche Bank National Trust Company ("DBNTC") and Mortgage Electronic Registration Systems, Inc. ("MERS") (collectively, "Respondents"). For the following reasons, we accept jurisdiction; grant relief in part, deny relief in part; and remand this case to the trial court for further proceedings consistent with this opinion.

¶ 2 This case involves an all-too familiar scenario taking place in Arizona and across America today; a homeowner defaults on her home loan, and the lender seeks to foreclose on the property. Here, Steinberger filed a complaint challenging Respondents' authority to foreclose on her home. Steinberger also

seeks damages for Respondents' alleged misconduct in relation to the foreclosure proceeding.

¶3 At its core, this case presents three basic legal questions. First, are there any circumstances under which a person who is facing foreclosure may challenge the authority of the party seeking foreclosure? The second question is related to the first; if there are such circumstances, what are the requirements, if any, for the party seeking foreclosure to establish its authority? Third, if the lender or its agent offers to modify (lower) the payments to assist the homeowner, is the lender/agent required to act reasonably in processing the loan modification?

¶4 In considering these issues, we emphasize that this opinion is limited to the legal sufficiency of Steinberger's complaint. The strength of the evidence supporting Steinberger's case is not before us in this special action.

### Factual and Procedural History [1]

¶5 In May 2005, Steinberger's father, Charles Perkins, took out a loan from Indy-Mac Bank, FSB ("IndyMac") to purchase a home. The original promissory note was signed on May 25, 2005, and identified the lender as IndyMac and the borrower as Charles Perkins. Contemporaneously with the note, Perkins also executed a deed of trust.

¶6 When Perkins passed away in December 2007, Steinberger inherited the property. Under the terms of the note, the monthly loan payments had nearly doubled by July 2008, and Steinberger was struggling to make her payments. In an effort to avoid defaulting on the loan, Steinberger contacted a representative at IndyMac to obtain a loan modification and lower the monthly payments. The representative told Steinberger that a loan modification was not available unless she was in default on the loan. Based on this phone call and subsequent conversations with IndyMac, Steinberger defaulted on her loan payments and applied for a loan modification.

¶7 By December 2008, Steinberger had completed the paperwork necessary for a loan modification and returned it to IndyMac Federal FSB ("IndyMac Federal").[2] Thereafter, Steinberger had a series of confusing communications with the various entities servicing her loan. During a telephone conversation in late December, an IndyMac Federal representative led Steinberger to believe that her loan would be modified. However, in February 2009, IndyMac Federal told Steinberger that because she was in default on the loan, a trustee's sale of the property was scheduled for May 2009.

¶8 Throughout the winter and spring of 2009, Steinberger repeatedly contacted representatives of IndyMac Federal, and later IndyMac Mortgage Services ("IndyMac Mortgage"),[3] in an effort to vacate the trustee's sale and obtain a loan modification. The trustee's sale was rescheduled to August 2009, and Steinberger continued to discuss obtaining a loan modification with representatives of Quality Loan Service Corporation ("QLS"), an entity assisting IndyMac Mortgage in servicing Steinberger's loan.

¶9 During the summer of 2009, the status of Steinberger's loan remained unresolved. Then, in late July, Steinberger was advised by a representative from IndyMac Mortgage that she had been granted a "loan forbearance" agreement. Under this agreement, Steinberger was allowed to make lower monthly payments until she qualified for a loan modification. The loan forbearance

---

1. In reviewing the trial court's decision to grant Respondents' motion to dismiss, we assume the truth of all well-pled allegations in Steinberger's complaint. *Cullen v. Auto–Owners Ins. Co.*, 218 Ariz. 417, 419, ¶7, 189 P.3d 344, 346 (2008).

2. Steinberger alleges that IndyMac ceased to exist on July 11, 2008 when it was taken over by the Federal Deposit Insurance Corporation ("FDIC") and its assets were placed into a new entity, IndyMac Federal. Thus, for ease of refer-

ence, for the allegations concerning Steinberger's contacts with IndyMac or IndyMac Federal commencing in July 2008, we simply refer to IndyMac Federal.

3. Steinberger alleges she received a letter in the spring of 2009 advising her that her loan had been transferred from IndyMac Federal to IndyMac Mortgage Services, a division of OneWest.

agreement was later extended to March 2010.

¶ 10 On January 11, 2010, a representative from IndyMac Mortgage advised Steinberger that it had received her loan modification paperwork and her monthly payment for the loan forbearance agreement. However, a few days later Steinberger was advised by a different representative from IndyMac Mortgage that a trustee's sale was set for January 21 because Steinberger had failed to send her modification paperwork and her loan forbearance payment. Confident that she had sent the paperwork and the payment, Steinberger contacted several representatives at IndyMac Mortgage in an effort to vacate the trustee's sale; however, she was advised by one representative that there would be no loan modification, and that it was "over." Steinberger then redoubled her efforts, and was eventually able to persuade the lender to cancel the sale. In addition, the loan forbearance agreement remained in place while her loan modification application was being processed.

¶ 11 In March 2010, IndyMac Mortgage advised Steinberger that her loan modification application had been approved for a ninety-day trial period. Steinberger sent her March payment to IndyMac Mortgage, which accepted the payment. However, in April, IndyMac Mortgage rejected Steinberger's payment on the ground she had failed to submit the proper paperwork. Thereafter, throughout the spring and summer of 2010, Steinberger continued to submit payments to IndyMac Mortgage, only to be told her payments could not be accepted because she had not submitted the proper paperwork. Then, in August, IndyMac Mortgage told Steinberger she had breached the ninety-day trial agreement because she had failed to submit her payments.

¶ 12 In late August and early September of 2010, Steinberger tried to maintain the ninety-day trial agreement, but by mid-September she was told the agreement was no longer valid because her loan modification request had been denied. A trustee's sale was

set for November, only to be continued again on the grounds a loan modification was "in the system" and still being processed. However, the loan modification agreement never came to fruition, and a trustee's sale was eventually set for January 10, 2011.

¶ 13 Steinberger sought to prevent the trustee's sale by filing a complaint in superior court in November 2010, and an amended complaint in December 2010. Steinberger's amended complaint alleged eleven causes of action: (1) a claim to vacate/set aside the substitution of trustee, the assignments of the deed of trust, and notice of the trustee's sale; (2) a temporary restraining order, preliminary injunction, and permanent injunction prohibiting the trustee's sale from going forward; (3) quiet title; (4) breach of contract; (5) negligent performance of an undertaking ("Good Samaritan Doctrine"); (6) fraudulent concealment; (7) common law fraud; (8) consumer fraud; (9) negligence per se; (10) unconscionable contract; and (11) discharge/payment of a debt.

¶ 14 The main remedy Steinberger sought in her complaint is a declaratory judgment that Respondents lack the authority to foreclose on her home, and that the notice of trustee's sale is null and void. Steinberger also sought payment of her attorneys' fees and punitive damages.

¶ 15 Steinberger obtained a temporary restraining order ("TRO") on January 6, 2011 [4] prohibiting Respondents from going forward with the trustee's sale. The TRO required her to post a $7,000 bond with the court.

¶ 16 Respondents moved to dismiss Steinberger's complaint, and the trial court granted their motion "for the reasons set forth in the moving Defendants' [Respondents'] Motion to Dismiss and Reply." Steinberger then filed this special action, and after hearing oral argument, we accepted jurisdiction and ordered the TRO to remain in place during the pendency of this special action.

## Jurisdiction

¶ 17 If the trustee's sale is allowed to go forward, Steinberger is in jeopardy of losing

---

4. Steinberger submitted the form of the TRO to the trial court in December 2010, but it was not signed by the court until January 2011. When the trial court signed the order, it crossed out "December," and inserted "Jan[uary] 6," but failed to change the year from 2010 to 2011.

her home and the $7,000 bond she posted for her TRO. As a result, we previously accepted special action jurisdiction because Steinberger has no "equally plain, speedy, and adequate remedy by appeal." Arizona Rule of Procedure for Special Action 1(a).

¶ 18 Respondents argue, however, that the loss of Steinberger's home in a trustee's sale is now moot, because after the petition was filed and following oral argument in this court, Respondent cancelled the trustee's sale. Moreover, Respondents assert it is their intention to "re-notice a trustee's sale in a manner which will cure and/or address each of the procedural defects alleged by Steinberger."

¶ 19 We conclude that Steinberger's special action is not moot. As we discuss below, many of Steinberger's claims raise substantive issues that cannot be cured by re-noticing a trustee's sale. *See infra* ¶¶ 38, 50–51, 59–62, 83–84, 86–87, 96–97. Therefore, if we were to decline jurisdiction, Steinberger would still face the loss of her home after a re-noticed trustee's sale.[5]

¶ 20 Moreover, we may consider moot questions if the issues are of great public importance or capable of repetition yet evading review. *Phx. Newspapers, Inc. v. Molera,* 200 Ariz. 457, 460, ¶ 12, 27 P.3d 814, 817 (App.2001). The legal issues in this case involving trustee's sales and foreclosure requirements are of statewide importance. *See BT Capital, LLC v. TD Service Co. of Ariz.,* 229 Ariz. 299, 300, ¶ 7, 275 P.3d 598, 599 (2012) (calling "the proper application of the statutes governing deeds of trust" an "issue of statewide importance").

¶ 21 Finally, we note the issues at stake in this case are pure questions of law, another factor weighing in favor of special action review. *State ex rel. Pennartz v. Olcavage,* 200 Ariz. 582, 585, ¶ 8, 30 P.3d 649, 652 (App.2001) ("Special action jurisdiction is more likely to be accepted in cases involving a matter of first impression, statewide significance, or pure questions of law.").

¶ 22 Accordingly, we accept special action jurisdiction of this case. Ariz. R.P. Spec. Act. 1(a); *Chartone, Inc. v. Bernini,* 207 Ariz. 162, 165–66, ¶¶ 7–9, 83 P.3d 1103, 1106–07 (App.2004).

## Discussion

¶ 23 When reviewing the grant of a motion to dismiss, we must "assume the truth of the well-pled factual allegations and indulge all reasonable inferences therefrom" in favor of the nonmoving party. *Cullen v. Auto–Owners Ins. Co.,* 218 Ariz. 417, 419, ¶ 7, 189 P.3d 344, 346 (2008). Our review looks only to the pleading itself; however, a "copy of a written instrument which is an exhibit to a pleading is a part thereof for all purposes." *Id.* at 419, ¶ 7, 189 P.3d at 346; *Strategic Dev. and Constr., Inc. v. 7th & Roosevelt Partners, LLC,* 224 Ariz. 60, 63, ¶ 10, 226 P.3d 1046, 1049 (App.2010); Arizona Rule of Civil Procedure 10(c).[6] We review issues of law, in-

---

5. The day after we accepted special action jurisdiction and took this matter under advisement, the trial court entered a judgment in favor of Respondents that included the appropriate Rule 54(b) language. As a result, Respondents argue we now lack subject matter jurisdiction over this special action because Steinberger did not timely file a notice of appeal from the trial court's final judgment while this special action was pending. In support of this argument, Respondents rely on *State ex rel. Neely v. Rodriguez,* 165 Ariz. 74, 796 P.2d 876 (1990), which provides that this court may "entertain special action jurisdiction only in matters that it might properly consider in an appeal." *Id.* In *Rodriguez,* however, the petitioner sought special action review after the deadline to file a notice of appeal had passed. Here, Steinberger sought special action review before the deadline for filing a notice of appeal—and, in fact, before the trial court signed a final judgment. And, more significantly, we had already

"accept[ed] special action jurisdiction of this matter" when we took this case under advisement on May 10, 2012, the day before the trial court entered a final judgment and well before the deadline for filing a notice of appeal, *e.g.,* June 11, 2012. Finally, we note that Arizona Revised Statute ("A.R.S.") section 12–120.21 was amended in 1990 to include "[j]urisdiction to hear and determine petitions for special actions brought pursuant to the rules of procedure for special actions, *without regard to its appellate jurisdiction.*" A.R.S. § 12–120.21(A)(4) (emphasis added).

6. Steinberger attached copies of the note, deed of trust, and the purported assignments and substitutions of trustee to her complaint; as a result, these documents may be properly considered as a part of her complaint in deciding whether she has adequately pled her claims.

cluding issues of statutory interpretation, de novo. *Coleman v. City of Mesa*, 230 Ariz. 352, 356, ¶ 8, 284 P.3d 863, 867 (2012).

### Counts One and Two: Vacate/Void Notice of Trustee's Sale

¶ 24 In Counts One and Two of her amended complaint, Steinberger seeks to avoid foreclosure by alleging that Respondents lack the authority to conduct a trustee's sale of her home.[7] Steinberger's claim is based upon a series of allegedly invalid title transfers. These transfers took place over a number of years and involved several different lenders and loan servicing agents.

#### A. The Original Note and Deed of Trust

¶ 25 The original promissory note and deed of trust executed by Steinberger's father were "distinct instruments that serve[d] different purposes." *Hogan v. Wash. Mut. Bank, N.A.*, 230 Ariz. 584, 587, ¶ 10, 277 P.3d 781, 784 (2012). Described in their simplest terms, both documents are evidence showing that a borrower owes a debt, e.g., to repay a loan. *Silving*, 800 F.Supp.2d at 1067–68. A promissory note "is a contract that evidences the loan and the obligor's [borrower's] duty to repay." *Hogan*, 230 Ariz. at 587, ¶ 10, 277 P.3d at 784. Similarly, a deed of trust is evidence that a property is held in trust to serve as collateral to secure "repayment of the money owed under the [promissory] note." *Id.*; A.R.S. §§ 33–801(8), –801(9), –801(11), –805 (2012).

¶ 26 One of the primary purposes served by a deed of trust is that it permits a non-judicial foreclosure sale. *Hogan*, 230 Ariz. at 585, ¶ 5, 277 P.3d at 782. "When parties execute a deed of trust and the debtor thereafter defaults, A.R.S. § 33–807 empowers the trustee to sell the real property securing the underlying note through a non-judicial sale." *Id.* at ¶ 5 (internal citations and quotations omitted). In contrast to foreclosures that require the filing of a judicial foreclosure action,[8] "[n]on-judicial foreclosure sales are meant to operate quickly and efficiently, 'outside of the judicial process.'" *Id.* at ¶ 12.

¶ 27 A deed of trust allows for a non-judicial foreclosure sale by creating rights and responsibilities in three individuals or entities: "trustee," "trustor," and "beneficiary." A.R.S. §§ 33–801(1), –801(10), –801(11); *Snyder v. HSBC Bank, USA, N.A.*, 873 F.Supp.2d 1139, 1148 (D.Ariz.2012). The borrower, or trustor, transfers legal title in the property to a trustee, while at the same time retaining possession of the property and enjoying the benefits of ownership. A.R.S. §§ 33–801(8), –801(10); *Eardley v. Greenberg*, 164 Ariz. 261, 264, 792 P.2d 724, 727 (1990); *Brant v. Hargrove*, 129 Ariz. 475, 480–81, 632 P.2d 978, 983–84 (App.1981). The trustee, in turn, holds bare legal title for the beneficiary, who is typically the original lender under the note. A.R.S. §§ 33–801(1), –801(10). Under a deed of trust, however, a trustee's title is limited: the trus-

---

7. Counts One and Two in Steinberger's amended complaint were dismissed by the trial court based on Respondents' argument that they allege remedies, not causes of action. We agree that several of the allegations in these counts relate to remedies, such as injunctive relief and attorneys' fees. *See City of Tucson v. Clear Channel Outdoor, Inc.*, 218 Ariz. 172, 187, ¶ 51, 181 P.3d 219, 234 (App.2008) ("An injunction is an equitable remedy...."). However, most of the allegations in these two counts plead a cause of action to vacate the substitution of trustee, the assignments of the deed of trust, and notice of the trustee's sale. We recognize that Steinberger's approach of interspersing prayers for relief and remedies amongst substantive allegations, as well as labeling the remedy for injunctive relief as a separate cause of action, is confusing. However, Steinberger's inartful pleading is not a basis for dismissal. Our Rules of Civil Procedure explicitly reject technical pleading standards and re-

quire only "[a] short and plain statement of the claim showing that the pleader is entitled to relief." Ariz. R. Civ. P. 8(a)(2); Ariz. R. Civ. P. 8(e)(1) (explaining that "[n]o technical forms of pleading or motions are required"). Moreover, in *Silving v. Wells Fargo Bank, NA*, 800 F.Supp.2d 1055, 1063 (D.Ariz.2011), the court determined that similar allegations withstood a motion to dismiss because they alleged "legal and equitable wrongs, not simply remedies." Thus, we vacate the trial court's order dismissing Count One. Further, we vacate the trial court's order dismissing the allegations contained in Count Two. However, we affirm the trial court's dismissal of Count Two as a separate cause of action for injunctive relief.

8. For example, mortgages must be foreclosed pursuant to a judicial foreclosure action. A.R.S. § 33–721.

tee essentially holds legal title for the sole purpose of selling the property if the trustor/borrower defaults on the note. A.R.S. § 33–807(A); *Eardley,* 164 Ariz. at 264, 792 P.2d at 727; *Brant,* 129 Ariz. at 480–81, 632 P.2d at 983–84.

¶ 28 In this case, the original deed of trust identifies the trustee as Chicago Title Insurance Company, and the trustor as Perkins. MERS [9] is named as the "beneficiary" under the deed of trust, and as nominal record holder of the deed on behalf of IndyMac and its "successors and assigns."

## B. First Assignment of Deed of Trust

¶ 29 In February 2009, MERS purportedly assigned its beneficial interest under the deed of trust to IndyMac Federal. The assignment was signed on February 13, 2009 by "Roger Stotts" in his capacity as a "vice president" for MERS. The document was allegedly witnessed and notarized by "Mai Thao" on March 23, 2009, and recorded on May 31, 2009.

¶ 30 Steinberger alleges there are several problems with this assignment. She asserts that at the time of the assignment, Roger Stotts was employed by IndyMac Federal, not MERS, and therefore Stotts had no authority to execute an assignment on behalf of MERS. Steinberger also alleges that the assignment was invalid because the notary, Mai Thao, did not personally witness Stotts' signature; rather, she notarized the document six weeks after Stotts signed it.[10] Finally, Steinberger asserts that MERS [11] could not assign its beneficial interest to IndyMac Federal, because IndyMac Federal was a nonexistent entity at the time of the assignment, i.e., IndyMac Federal's assets were liquidated by the FDIC and sold to OneWest on March 19, 2009.

**9.** MERS is an electronic registration system created by the banking industry to streamline the transfer, sale and assignment of home loans. *Cervantes v. Countrywide Home Loans, Inc.,* 656 F.3d 1034, 1039 (9th Cir.2011); *Jackson v. Mortgage Electronic Registration Systems, Inc.,* 770 N.W.2d 487, 490 (S.Ct.Minn.2009). *See also* Robert E. Dordan, *Mortgage Electronic Registration Systems (MERS), Its Recent Legal Battles, and the Chance for a Peaceful Existence,* 12 Loy. J. Pub. Int. L. 177, 180–81 (2010). MERS does not originate or lend money for home loans. *Jackson,* 770 N.W.2d at 490. Rather, MERS serves as a nominal record holder for loans owned by its members, which include lenders and investors, thereby permitting its members to sell and assign home loans without having to record each assignment or transfer with the local county recorder's office. *Cervantes,* 656 F.3d at 1039 (internal quotations omitted); *Jackson,* 770 N.W.2d at 490; *see* A.R.S. § 33–804 ("A notice of substitution of trustee shall be recorded" in each county where trust property is located). *But see In Re Vasquez,* 228 Ariz. 357, 266 P.3d 1053 (2011) (holding that in Arizona, recording assignment/transfer of beneficial interest in deed of trust is not required under A.R.S. § 33–808 prior to filing a notice of trustee's sale). Thus, "[i]f [a] lender sells or assigns the beneficial interest in the loan to another MERS member, the change is recorded only in the MERS database, not in county records, because MERS continues to hold the deed [of trust] on the new lender's behalf," *e.g.,* as the deed of trust's nominal beneficiary. *Cervantes,* 656 F.3d at 1039.

Listing MERS as a nominal beneficiary in the deed of trust facilitates a process common in the home lending industry today known as "securitization." Securitization describes the process by which large numbers of home loans are "pooled into a trust and converted into mortgage-backed securities that can be bought and sold by investors." *United States Bank Nat. Ass'n v. Ibanez,* 458 Mass. 637, 941 N.E.2d 40, 46 (Mass.2011). The basis for profits under this system is not the collection of interest on the loan itself, but rather the fees charged by lenders when they sell the right/title to collect interest on the loan to another lender or investor. As a result, profits are generated by the volume of loan sales and transfers, which in turn requires a vehicle such as MERS to expedite the transfer and assignment of loans. *See, e.g.,* Elizabeth Renuart, *Property Title Trouble in Non-Judicial Foreclosure States; The Ibanez Time Bomb?* 4 Wm. & Mary L.Rev. 111, 128–131 (2013); Kurt Eggert, *The Great Collapse: How Securitization Caused the Subprime Meltdown,* 41 Conn. L.Rev. 1257, 1266 (2009).

**10.** In furtherance of this allegation, Steinberger alleges that Stotts signed the assignment in Travis County, Texas, while Thao's notarization stamp shows that she witnessed his signature in Williamson County, Texas.

**11.** We reject Steinberger's claim that MERS, as the original beneficiary, did not have the authority to assign its beneficial interest in the deed of trust because it never had possession of the note. As stated above, a note and a deed of trust are "distinct instruments that serve different purposes." *See supra,* ¶ 24. Thus, whether MERS possessed the note is irrelevant in determining whether MERS had the authority to assign or transfer its beneficial interest in the deed of trust. *Hogan,* 230 Ariz. at 587, ¶ 10, 277 P.3d at 784; *Silving,* 800 F.Supp.2d at 1067–68.

### C. Substitution of Trustee

¶ 31 On February 17, 2009, a Substitution of Trustee was signed by Jim Montes in his capacity as "vice president" of QLS, and as "authorized agent" for IndyMac Federal, the purported beneficiary (after the first assignment) under the deed of trust. Steinberger alleges that QLS was an entity that assisted IndyMac Mortgage Services, a division of OneWest, in servicing loans for OneWest. The substitution purports to substitute QLS for Chicago Title as the trustee under the deed of trust. The notice of substitution was recorded on February 17, 2009.

¶ 32 Steinberger alleges this substitution was void for a number of reasons. She contends MERS' assignment of its beneficial interest to IndyMac Federal was void and, therefore, IndyMac Federal had no authority to substitute QLS as trustee. *See supra,* ¶ 29. Steinberger also asserts that Montes was simply a clerk for QLS, and had no authority to act on behalf of QLS. Steinberger further alleges that QLS could not substitute itself as trustee, was not an authorized agent of IndyMac Federal, and had no authority to act on behalf of IndyMac Federal in executing the substitution.

### D. Second Assignment of Deed of Trust

¶ 33 On May 25, 2010, IndyMac Federal allegedly assigned its beneficial interest in the deed of trust to DBNTC.[12] The assignment was executed by Erica A. Johnson–Seck as "attorney in fact" for IndyMac Federal, and was recorded on June 2, 2010.

¶ 34 Steinberger alleges this assignment was also invalid. Steinberger asserts IndyMac Federal no longer existed in May 2010, and therefore had no beneficial interest to assign to DBNTC. Even if IndyMac Federal had been in existence, Steinberger claims that the first assignment from MERS to IndyMac Federal was invalid and, as a result, IndyMac Federal had no valid beneficial interest to assign to DBNTC. Steinberger further contends that Johnson–Seck had no authority to sign as attorney in fact for IndyMac Federal, and that as a "notorious robo-signer," she did not review the assignment nor was it likely her signature was witnessed by the notary who notarized the document.

¶ 35 Steinberger also asserts the assignment was void under the "Pool and Servicing Agreement" ("PSA"), which governs the certificates held by the investors in the Pooled Trust. Under the PSA, all documents pertaining to loans that make up the Pooled Trust must be transferred to it by the closing date of the original loan unless the loans are held by MERS as beneficiary. Here, the subject loan was not assigned or transferred to the Pooled Trust until May 2010, or five years after the May 2005 closing on the loan. In addition, at the time of the assignment to the Pooled Trust, MERS no longer held title to the loan as beneficiary; MERS purportedly assigned its beneficial interest to IndyMac Federal in February 2009, a year before Steinberger's deed of trust was assigned to the Pooled Trust.

### E. Respondents' Chain of Title

¶ 36 In sum, according to Steinberger, Respondents' purported authority to foreclose on her property is based on the following chain of title originating from the May 25, 2005 deed of trust: (1) the trustee was originally Chicago Title Company, then QLS; and (2) the beneficiary was originally MERS, then IndyMac Federal, and finally the Pooled Trust. Steinberger asserts that all of the transfers in this purported chain of title are invalid, and therefore Respondents do not have the authority to foreclose on her home.

### F. *Hogan:* Cause of Action to Avoid a Trustee's Sale

■ ¶ 37 Our starting point in analyzing Steinberger's cause of action to avoid the trustee's sale is our supreme court's decision

---

12. DBNTC was assigned the beneficial interest in its capacity as "Trustee of IndyMacINDX Mortgage Loan Trust 2005–AR14 Mortgage Pass–Through Certificates, Series 2005–AR14 under a Pooling and Servicing Agreement dated June 1, 2005" (the "Pooled Trust"). Steinberger alleges that the Pooled Trust, as the purported beneficiary of the deed of trust, consists of billions of dollars in assets and an unknown number of investors and certificate holders. The alleged beneficiary under the deed of trust was the Pooled Trust, not DBNTC. DBNTC merely served as the trustee of the Pooled Trust, i.e., the administrator/representative of the Pooled Trust.

in *Hogan v. Wash. Mut. Bank, N.A.*, 230 Ariz. 584, 585, ¶ 1, 277 P.3d 781, 782 (2012). In *Hogan*, our supreme court held that "Arizona's non-judicial foreclosure statutes do not require the beneficiary [of a deed of trust] to prove its authority" or to show possession of the original promissory note "before the trustee may commence a non-judicial foreclosure." *Id.* The supreme court acknowledged that "a deed of trust, like a mortgage, may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures." *Id.* at 586, ¶ 6, 277 P.3d at 783 (internal quotations and citations omitted). However, because the borrower/trustor in *Hogan* never affirmatively alleged the trustee(s) lacked the authority to conduct a trustee's sale, the supreme court did not address this issue in its decision. *Id.* at 586, ¶¶ 6–7, 277 P.3d at 783 (explaining that it was important to the court's analysis that "Hogan ha[d] not alleged that WaMu and Deutsche Bank are not entitled to enforce the underlying note," and that the complaint had not "affirmatively allege[d] that WaMu and Deutsche Bank are not the holders of the notes in question or that they otherwise lack authority to enforce the notes").

¶ 38 Unlike the borrower/trustor in *Hogan*, Steinberger has affirmatively alleged that Respondents do not have the authority to conduct a trustee's sale on her property. Steinberger's claim is supported by a number of detailed allegations that, if proven, would seriously undermine the validity of the title transfers to Respondents. Therefore, we conclude Steinberger has pled a valid cause of action to prevent/avoid the trustee's sale based on the Respondents' alleged lack of the authority to conduct a trustee's sale of her home.

¶ 39 Our conclusion is supported by the supreme court's decision in *Eardley v. Greenberg*, 164 Ariz. 261, 792 P.2d 724 (1990). In *Eardley*, a borrower/trustor filed an ac-

tion to set aside a trustee's sale on the grounds the notice of substitution of trustee was defective. Greenberg, the beneficiary who executed the notice, and the alleged successor trustee, Investment Security, Inc., filed a motion for summary judgment, which the trial court granted. *Id.* at 263, 792 P.2d at 726. The supreme court reversed, holding that a triable issue existed as to whether the substitution was defective, because the notice may have been signed by Greenberg without authority or permission from one of the other beneficiaries. In reaching this conclusion, the supreme court stated:

> The trustor, trustee, and beneficiary are inextricably interconnected links in the chain of title to real property. Each has certain rights, legal or equitable, separated from the complete bundle of real property rights ... the trustee is the holder of legal title ... [T]he beneficiary holds an enforceable lien on the property. The trustor possesses the bulk of the bundle of rights, *but it is obvious that the trustor's ability to deal with those rights can be effectively eliminated by uncertainties in the chain of title concerning either the beneficiaries or the trustee.*

*Id.* at 265, 792 P.2d at 728 (emphasis added).

¶ 40 The supreme court ultimately remanded the case to the trial court, holding "that the trustor has standing to inquire into and raise objections about the process by which a trustee has been substituted." *Id.* [13]

¶ 41 We are mindful that "[n]on-judicial foreclosure sales are meant to operate quickly and efficiently," *Hogan*, 230 Ariz. at 587, ¶ 12, 277 P.3d at 784, and that litigation inevitably slows down the foreclosure process. It is also true, however, that deed of trust procedures "strip borrowers of many protections available" in judicial foreclosure actions, and as a result "lenders must strictly comply with the Deed of Trust statutes, and the statutes and Deeds of Trust must be

---

13. Our conclusion is also supported by A.R.S. § 33–807(A) which provides, in relevant part, that "[B]y virtue of his *position*, a power of sale is conferred upon the trustee of a trust deed...." (Emphasis added.) This language, on its face, suggests that only the "true," legally authorized trustee may, by virtue of his "position," exercise the power of sale. *New Sun Bus. Park, LLC v.*

*Yuma Cnty.*, 221 Ariz. 43, 46, ¶ 12, 209 P.3d 179, 182 (App.2009) (citing *Nordstrom, Inc. v. Maricopa Cnty.*, 207 Ariz. 553, 556, ¶ 10, 88 P.3d 1165, 1168 (App.2004)) ("When determining the meaning of a statute, we first look to the plain language of the statute as the most reliable indicator of its meaning.").

strictly construed in favor of the borrower." *Patton v. First Fed. Sav. & Loan Ass'n of Phx.*, 118 Ariz. 473, 477, 578 P.2d 152, 156 (1978). In this age of securitized home loans, the average borrower may be confused by the frequent transfers and re-assignments of his home loan. Thus, if a borrower is in default and possesses a good faith basis to dispute the authority of an entity to conduct a trustee's sale, the borrower should not be prohibited from challenging its authority simply because such action may slow down the foreclosure process.

¶ 42 Of course, there are some important limits on a borrower's right to avoid a trustee's sale. First, absent an affirmative allegation by the borrower that the trustee or beneficiary is not, in fact, the "true" trustee/beneficiary, the trustee or beneficiary may conduct a trustee's sale without having to demonstrate his authority to foreclose. *Hogan*, 230 Ariz. at 586, ¶ 5, 277 P.3d at 783. Second, our decision will affect only those borrowers/trustors who obtain a TRO or injunction prior to the trustee's sale. Pursuant to A.R.S. § 33–811(C), once a non-judicial foreclosure sale has taken place, the only defense that may be raised is lack of notice of the sale. *See Madison v. Groseth*, 230 Ariz. 8, 10–13, ¶¶ 1, 5, 8–15, 279 P.3d 633, 635–638 (App.2012) (interpreting A.R.S. § 33–811(C) and explaining that the mortgagor "waived all defenses and objections to

the sale" by failing to obtain an injunction or TRO prior to the sale).

¶ 43 On remand, Steinberger bears the burden of proving her claim that Respondents lack the authority to conduct a trustee's sale. Respondents may rebut this claim with evidence showing they are in fact the "true" beneficiary or trustee of the deed of trust. Such proof may consist of documents in the chain of title tracing Respondents' beneficial interest from the original beneficiary, such as assignments, substitutions or a power of attorney. *But cf. Hogan*, 230 Ariz. at 586, ¶ 8, 277 P.3d at 783 (holding that Arizona has rejected "show-me-the-note" arguments as requisite proof to conduct a trustee's sale). If these documents are not available, then affidavits or deposition testimony from persons involved in the transfers may suffice as evidence of the chain of title.[14]

### Count Five: Negligent Performance of an Undertaking

¶ 44 In support of her claim for "negligent performance of an undertaking," Steinberger alleges (1) Respondents lured her into defaulting on her loan with the prospect of a loan modification and (2) then negligently administered her application for the modification, causing her to fall so far behind on her payments that it was no longer possible to reinstate her original loan. Steinberger

---

**14.** For example, several cases from other jurisdictions provide guidance on alternative methods for proving the authority to enforce a promissory note when the note has been misplaced or lost. *See Beaumont v. Bank of N.Y. Mellon*, 81 So.3d 553, 554–555 (Fla.App.2012) (bank attempting to recover on a lost promissory note could not do so because the bank failed to prove who lost the note and when it was lost, offered no proof of anyone's right to enforce the note when it was lost, and produced no evidence of ownership of the note); *In re Gavin*, 319 B.R. 27, 30–31 (1st Cir. BAP 2004) (analyzing Massachusetts law and explaining that where the note had been lost, right to enforce the note could be proven by alleged assignee of the note with direct evidence establishing the terms of the loan and the assignee's ownership of the loan, on the condition that adequate protection against loss from another party's claim to own the note was provided); *A.I. Credit Corp. v. Gohres*, 299 F.Supp.2d 1156, 1160–1161 (D.Nev.2004) (under Nevada law, the fact that the lender was not in actual possession of the note did not bar it from enforcing the note against borrowers; sufficient proof of ownership

of the note provided where evidence showed the note had been in possession of borrower's attorney, the lender was entitled to possession of the note prior to its loss, and the lender's attorney gave sworn testimony that the note was destroyed during a fire in his office).

We recognize that each of the aforementioned cases analyzes the applicable state's version of Uniform Commercial Code § 3–309, and that the UCC does not govern liens on real property. As stated by our supreme court in *Hogan*, "[t]he trust deed statutes do not require compliance with the UCC before a trustee commences a non-judicial foreclosure," *Hogan*, 230 Ariz. at 586, ¶ 9, 277 P.3d at 783. It is also true that Arizona's version of the same UCC section (A.R.S. § 47–3309) may differ from the versions analyzed in these cases. However, although the methods outlined in the UCC for determining who qualifies as a "person entitled to enforce an instrument" are not binding authority, they do provide general guidance as to how a party may attempt to prove beneficiary status.

alleges that she never obtained a loan modification, and that Respondents' conduct ultimately led to the foreclosure on her home.

¶ 45 Arizona recognizes a cause of action for negligent performance of an undertaking as it is summarized in the Restatement (Second) of Torts:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965); *see also McCutchen v. Hill*, 147 Ariz. 401, 404, 710 P.2d 1056, 1059 (1985); *Lloyd v. State Farm Mut. Auto. Ins. Co.*, 176 Ariz. 247, 250, 860 P.2d 1300, 1303 (App.1992).

¶ 46 Thus, under § 323, a party may assume the duty to act with reasonable care even though it otherwise had no duty to do so. Under this "Good Samaritan Doctrine," a party may be liable for negligent performance of an assumed duty by either: (1) increasing the risk of harm to another, or (2) causing another to suffer harm because he or she relied on the party exercising reasonable care in undertaking the duty. Restatement (Second) of Torts § 323; *Lloyd*, 176 Ariz. at 250, 860 P.2d at 1303.

¶ 47 Steinberger's Good Samaritan claim alleges increased risk of economic harm, rather than physical harm. The Arizona Supreme Court has extended the Good Samaritan Doctrine beyond ordinary physical harm to include economic harm. *McCutchen*, 147 Ariz. at 404, 710 P.2d at 1059; *see Lloyd*, 176 Ariz. at 250, 860 P.2d at 1303 (citing

*McCutchen*, the court held that § 323 liability includes economic harm as well as physical harm); *Jeter v. Mayo Clinic Ariz.*, 211 Ariz. 386, 402, ¶ 70, 121 P.3d 1256, 1272 (App.2005) (a person assuming a duty under § 323 may, in addition to liability for physical harm, be liable for economic harm); *Renteria v. United States*, 452 F.Supp.2d 910, 914 (D.Ariz. 2006) (applying Arizona law, the court held that "*Lloyd* and *Jeter* make clear that the Good Samaritan Doctrine applies to economic harm"); *Silving*, 800 F.Supp.2d at 1073 (explaining that the Good Samaritan Doctrine applies to economic harm and recognizing the doctrine applies to loan modification procedures in a mortgage foreclosure case).

¶ 48 To state a claim for increased risk of economic harm, Steinberger was required to allege the following elements: (1) Respondents undertook to render services to Steinberger that they should have recognized were necessary for the protection of Steinberger's property, (2) Respondents' failure to exercise reasonable care while doing so increased the risk of harm to Steinberger, and (3) Steinberger was in fact harmed because of Respondents' actions. *See* Restatement (Second) of Torts § 323.

¶ 49 The trial court dismissed Steinberger's claim based on Respondents' assertion that (1) Steinberger did not allege that Respondents' actions increased the risk of harm, (2) Steinberger did not allege that Respondents' acts caused her harm, and (3) Steinberger did not allege a legal basis for reliance on the alleged modification program.[15]

¶ 50 We disagree. The complaint alleges a legally sufficient claim that Respondents' negligent administration of the loan modification increased the risk that Steinberger would default on her loan and lose her home in foreclosure. Further, the complaint alleg-

---

**15.** In their motion to dismiss in the trial court, Respondents also argued that Steinberger's claim was barred by the economic loss rule. *See Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 Ariz. 320, 323, 329, ¶¶ 11–12, 46, 223 P.3d 664, 667, 673 (2010) (defining the economic loss rule as a "common law rule limiting a contracting party to the contractual remedies for the recovery of economic losses unac-

companied by physical injury to persons or other property."). However, Respondents do not raise this issue in their brief, and therefore we will not consider it now. *Schabel v. Deer Valley Unified School Dist. No. 97*, 186 Ariz. 161, 167, 920 P.2d 41, 47 (App.1996). We express no opinion regarding the potential application of the economic loss rule to this case on remand.

es that Respondents' conduct "resulted in economic harm to the Plaintiff [Steinberger] in the form of late fees, principal and interest accrual, damage to credit, retention of loan modification companies, and other harm." Finally, Steinberger was not required to allege reliance on Respondents' loan modification program, because her claim was based on an "increased risk of harm" theory under Restatement (Second) of Torts subsection 323(a), rather than a "reliance" theory under subsection (b).

¶ 51 In sum, we hold that Steinberger alleged a cognizable claim under the Good Samaritan Doctrine. We emphasize that our holding is limited to the particular allegations in this case. Specifically, a lender may be held liable under the Good Samaritan Doctrine when: (1) a lender, or its agent/representative, induces a borrower to default on his or her loan by promising a loan modification if he or she defaults; (2) the borrower, in reliance on the promise to modify the loan, subsequently defaults on the loan; (3) after the borrower defaults, the lender or its agent/representative negligently processes or fails to process the loan modification, or due to the lender/agent/representative's negligence, the borrower is not granted a loan modification; and (4) based on the default, the lender subsequently forecloses on the borrower's property.

¶ 52 As a final argument, Respondents assert that any alleged harm to Steinberger "had already occurred at the time of [their] actions and [was] caused by Steinberger's own failure to make her mortgage payment." In essence, Respondents' argument amounts to a factual challenge to Steinberger's allegation that she did not default until Respondents lured her into default. However, we do not resolve factual disputes at the pleading stage; our review is limited to the legal sufficiency of Steinberger's claim. *Moretto v. Samaritan Health Sys.*, 190 Ariz. 343, 346, 947 P.2d 917, 920 (App.1997). As a result, we conclude that Steinberger's allegation that Respondents' conduct caused her harm is legally sufficient to support her claim.

¶ 53 Accordingly, we vacate the trial court's dismissal of Steinberger's Good Samaritan claim.

### Count Nine: Negligence Per Se

¶ 54 Steinberger's negligence per se claim was dismissed based on Respondents' arguments that: (1) Steinberger had provided "no plausible factual support" for this claim, (2) the complaint did not properly allege that Respondents violated a criminal statute, and (3) Arizona does not recognize a negligence per se cause of action for acts that violate A.R.S. § 39–161.[16]

¶ 55 The "plausibility," or sufficiency of Steinberger's evidence, is not, as Respondents suggest, at issue in determining the legal sufficiency of her complaint. *Moretto,* 190 Ariz. at 346, 947 P.2d at 920. In addition, Steinberger has alleged sufficient facts to establish a violation of A.R.S. § 39–161. Steinberger alleges that Respondents violated A.R.S. § 39–161 by: (1) recording a Notice of Trustee's Sale dated February 17, 2009, that was signed without authority by Jim Montes; (2) recording the February 2009 and May 2010 Assignments, with the knowledge that both Assignments were made on behalf of non-existent entities, by persons who had no authority to execute the assignments, and were notarized by persons who did not witness the signatures; and (3) recording the February 2009 Notice of Substitution of Trustee, with the knowledge that it was executed by a person who did not have authority to execute the Notice, by and on behalf of entities that did not have the authority to execute the Notice. See *supra,* ¶¶ 28–35. *See Deering v. Carter,* 92 Ariz. 329, 333, 376 P.2d 857, 860 (1962) ("In establishing [negligence per se], the jury need only find that the party committed the specif-

---

16. Under A.R.S. § 39-161,

A person who acknowledges, certifies, notarizes, procures or offers to be filed, registered or recorded in a public office in this state an instrument he knows to be false or forged, which, if genuine, could be filed, registered or recorded under any law of this state or the United States, or in compliance with established procedure is guilty of a class 6 felony. As used in this section "instrument" includes a written instrument as defined in section 13–2001.

ic act prohibited, or omitted to do the specific act required by the statute or ordinance.").

¶ 56 The question remains, however, whether Arizona recognizes a negligence per se cause of action for violations of A.R.S. § 39–161. As a general matter, a claim for negligence per se must be based on a statute enacted "for the protection and safety of the public." *Good v. City of Glendale*, 150 Ariz. 218, 221, 722 P.2d 386, 389 (App.1986). Because A.R.S. § 39–161 is a criminal statute, we conclude that it was enacted for the protection and safety of the public. *Good*, 150 Ariz. at 221, 722 P.2d at 389.

¶ 57 However, our negligence per se analysis does not end there; we must also determine: (1) the purpose of A.R.S. § 39–161, and whether Steinberger, as alleged in her complaint, falls within the class of persons the statute is intended to protect, and (2) whether we should adopt the standard of conduct defined in A.R.S. § 39–161 as a negligence standard. *Id;* Restatement (Second) of Torts § 288; *Jackson v. City of Scottsdale*, 127 Ariz. 53, 54–55, 617 P.2d 1169, 1170–71 (App.1980) (citing this section of the Restatement).

¶ 58 Our supreme court has explained that the purpose of A.R.S. § 39–161 is "to protect the integrity of our system of recordation of instruments" and prevent "the placing of false or fictitious instruments of record which might have the effect to cloud the record." *State v. Edgar*, 124 Ariz. 472, 475, 605 P.2d 450, 453 (1979) (quoting a California case that analyzed the purpose for the California statute on which Arizona's statute was based). To promote this purpose, the statute prohibits any person or entity from recording false instruments that give rise to fraudulent, baseless claims of interest in real property. *See id.* Moreover, the statute is intended to protect anyone who is adversely affected by a cloud on title due to the recording of a false instrument. *Id.* at 475, 605 P.2d at 453.

¶ 59 Steinberger alleges that Respondents (1) were not the true beneficiaries or trustees

under the deed of trust,[17] and (2) they recorded false instruments that created a fraudulent, baseless interest in her home. This, in turn, led to Respondents' allegedly fraudulent and unauthorized effort to foreclose on her home. Based on these allegations, we conclude that Steinberger falls within the class of persons the statute is intended to protect.

¶ 60 Finally, in addressing whether A.R.S. § 39–161 should be adopted as the standard of conduct for Steinberger's negligence per se claim, we turn to Restatement (Second) of Torts § 288. Section 288 lists a number of situations in which "[t]he court will not adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation." Restatement (Second) of Torts § 288; *Jackson*, 127 Ariz. at 54–55, 617 P.2d at 1170–71. Examples of statutory purposes that will prevent a court from adopting a statute as the standard of conduct are: when the statutory purpose is exclusively

a) to protect the interests of the state or any subdivision of it as such, or

b) to secure to individuals the enjoyment of rights or privileges to which they are entitled only as members of the public, or

c) to impose upon the actor the performance of a service which the state or any subdivision of it undertakes to give the public, or

d) to protect a class of persons other than the one whose interests are invaded, or

e) to protect another interest than the one invaded, or

f) to protect against other harm than that which has resulted, or

g) to protect against any other hazards than that from which the harm has resulted.

Restatement (Second) of Torts § 288.

¶ 61 Here, none of the purposes listed in Section 288 are the exclusive purposes of

---

**17.** As we noted in interpreting a similar recording statute, A.R.S. § 33–420, a misrepresentation in a recorded instrument may be material where the borrower/trustor alleges the putative beneficiary is not, in fact, the true beneficiary, *e.g.,* for

the purposes of anti-deficiency protection. *Sitton v. Deutsche Bank Nat. Trust Co.*, 233 Ariz. 215, 222 n. 6, ¶ 33, 311 P.3d 237, 244 n. 6 (App.2013).

A.R.S. § 39–161. We therefore see no reason precluding the adoption of this statute as the standard of conduct for Steinberger's negligence per se claim.

¶ 62 For the reasons stated above, we find that Steinberger has sufficiently pled a negligence per se claim for Respondents' alleged violation of A.R.S. § 39–161, and thus vacate the trial court's dismissal of this claim.

### Count Three: Quiet Title

¶ 63 Steinberger bases her quiet title claim on A.R.S. § 12–1101, which provides that a person having or claiming an interest in real property may bring an action to quiet title to that property "against any person . . . when such person . . . claims an estate or interest in the real property which is adverse to the party bringing the action." The trial court dismissed Steinberger's claim based on Respondents' argument that Steinberger failed to plead any willingness or ability to pay off her loan. Respondents' argument is based on *Farrell v. West*, 57 Ariz. 490, 491, 114 P.2d 910, 911 (1941), which held that "if it appears there is an unsatisfied balance due a defendant-mortgagee, or his assignee, the court will not quiet the title until and unless he [plaintiff] pays off such mortgage lien . . . ."

¶ 64 Steinberger argues the trial court erred in dismissing her claim because the *Farrell* rule does not apply to her case. Steinberger asserts that unlike *Farrell*, she is not seeking to quiet title against the "true" beneficiary under the deed of trust. Rather, she only seeks to establish that her title is superior to the Respondents', claiming none of the Respondents is the proper beneficiary or agent of the proper beneficiary under the loan documents and subsequent assignments. *See Silving*, 800 F.Supp.2d at 1069–70 (holding that plaintiffs' failure to pay the debt, or to allege a willingness to pay the debt, was not dispositive as to plaintiffs' quiet title action against defendants, where plaintiffs alleged that defendants were not true beneficiaries under a deed of trust; the court stated that "the dispositive issue is whether Plaintiffs have superior claims to specific rights as against Defendants, not whether Plaintiffs' actions (i.e., placing title

in trust with a non-party or failing to discharge the debt) would defeat their claim as against everyone in the world and deliver them clear title.").

¶ 65 We conclude it was proper to dismiss Steinberger's quiet title claim. A plaintiff pursuing a quiet title action must allege he holds title to the property; he cannot seek to quiet title solely based on the alleged weaknesses of his adversary's title. *Allison v. State*, 101 Ariz. 418, 421, 420 P.2d 289, 292 (1966); *Price v. Sunfield*, 57 Ariz. 142, 146, 112 P.2d 210, 212 (1941); *Verde Water & Power Co. v. Salt River Valley Water Users' Ass'n*, 22 Ariz. 305, 307, 197 P. 227, 228 (1921). Steinberger, however, does not possess legal title to the property; under the deed of trust, the trustee holds legal title until the loan balance is paid. A.R.S. §§ 33–801(8), –801(10) (2007); *Eardley*, 164 Ariz. at 264, 792 P.2d at 727; *Brant*, 129 Ariz. at 480–81, 632 P.2d at 983–84. Thus, her quiet title claim is based solely on the alleged deficiencies of the putative trustee and beneficiary, and not on the strength of her own title. Moreover, we agree with the trial court that Steinberger's failure to plead a willingness or ability to pay off the loan was, pursuant to *Farrell*, grounds for dismissal.

¶ 66 For these reasons, we conclude that Steinberger's quiet title claim was properly dismissed by the trial court.

### Count Four: Breach of Contract

¶ 67 To state a breach of contract claim, a plaintiff must allege that (1) a contract existed, (2) it was breached, and (3) the breach resulted in damages. *Thunderbird Metallurgical, Inc. v. Ariz. Testing Labs.*, 5 Ariz.App. 48, 50, 423 P.2d 124, 126 (1967) (internal citation omitted).

¶ 68 Steinberger's breach of contract claim was dismissed based on Respondents' argument that (1) the complaint did not allege a breach of any provision in the deed of trust or promissory note and (2) the complaint did not allege any "resulting" damages.

¶ 69 While Steinberger's allegations concerning breach of contract are interspersed

throughout the complaint, when read as a whole, the complaint does identify several alleged breaches of the note and the deed of trust. Specifically, the complaint alleges that Respondents failed to qualify as the "Note Holder" or "Lender" under the note and deed of trust, and that they failed to comply with certain procedures that the note and deed of trust required them to complete before they could attempt to foreclose on her home. These requirements included sending a 30–day notice of default and giving written notice of the default to the trustee.

¶ 70 Respondents attempt to characterize these allegations as a "show-me-the-note" argument. *See Hogan*, 230 Ariz. at 586, ¶ 8, 277 P.3d at 783 ("[T]he deed of trust statutes impose no obligation on the beneficiary to 'show the note' before the trustee conducts a non-judicial foreclosure."). However, Steinberger does not argue that the true beneficiary must show the note prior to foreclosure. Instead, she argues that prior to initiating foreclosure proceedings, the true beneficiary or trustee must at least follow the enforcement provisions contained in the note and deed of trust. Here, Steinberger contends that if Respondents are in fact the true beneficiaries or trustees of the deed of trust, their failure to comply with these provisions constituted a breach of the note and deed of trust. These allegations sufficiently allege breaches of the deed of trust and promissory note.

¶ 71 The complaint also sufficiently alleges that Steinberger suffered damages as a result of Respondents' breach(es). These damages consist of "attorney's fees, costs, late charges, negative amortization of the Note, accruing interest, retention of loan modification companies, and other damage."

¶ 72 Respondents argue that Steinberger's alleged damages are not the result of their breach, but the result of Steinberger's failure to repay the loan. Respondents' argument essentially focuses on Steinberger's ability to prove causation of her damages. However, factual disputes are not addressed at the pleadings stage; our review is limited to the legal sufficiency of the allegations contained in Steinberger's complaint. *See Cullen*, 218 Ariz. at 419, ¶ 7, 189 P.3d at 346. Thus, we

conclude that Steinberger has sufficiently pled a claim for breach of contract, and we vacate the dismissal of this claim.

## Counts Six, Seven and Eight: Fraudulent Concealment, Common Law Fraud, Consumer Fraud

 ¶ 73 Claims based on fraud must be pled with particularity. Ariz. R. Civ. P. 9(b). Thus, "[a]lthough there is no 'magic language' required to state a claim for fraud," a claimant must "plead all the essential elements of ... fraud" in the complaint. *Linder v. Brown & Herrick*, 189 Ariz. 398, 404–05, 943 P.2d 758, 764–65 (App.1997). The purpose of this requirement is to provide notice to the opposing parties so that it can prepare an adequate answer to the allegations. *Schreiber Distrib. Co. v. Serv–Well Furniture Co. Inc.*, 806 F.2d 1393, 1400 (9th Cir.1986); *See also Spudnuts, Inc. v. Lane*, 131 Ariz. 424, 426, 641 P.2d 912, 914 (App. 1982) (purpose of particularity requirement is to avoid surprise at trial).

 ¶ 74 Steinberger's fraud-based claims (fraudulent concealment, common law fraud, and consumer fraud) were dismissed, in part, because the allegations improperly aggregated the alleged misconduct of Respondents and accused them collectively of acting fraudulently. We agree. Steinberger's complaint fails to identify *which* Respondent engaged in any particular fraudulent conduct. Instead, the complaint generically alleges that "Defendants" engaged in a variety of behaviors that purportedly amounted to fraudulent conduct. However, there are at least five separate Respondents who were involved in Steinberger's loan over the course of several years. Without a more specific identification of the actors involved and their alleged misconduct, it would be extremely difficult for Respondents to respond to these allegations. As a result, we conclude Steinberger's fraud claims were not alleged with particularity, violating the Rule 9(b) requirement that a defendant be given sufficient notice of its alleged misconduct so that it can adequately answer the charge.

¶ 75 In her special action petition, Steinberger now contends the Respondents

worked in concert to accomplish the fraud. However, Steinberger's complaint does not make any such allegation. Even if it had, such a conclusory allegation, absent some type of detailed supporting allegations, would be insufficient to withstand general pleading standards, much less the more stringent requirements of Rule 9(b). *Cullen*, 218 Ariz. at 419, ¶ 7, 189 P.3d at 346 (stating that "mere conclusory statements are insufficient").

¶ 76 Steinberger argues, however, that the pleading standards should be relaxed here because she cannot be expected to allege facts that are peculiarly within Respondents' knowledge. She argues that her allegations are "the best that [she] can do in the absence of inside information which can be obtained only through depositions." In support of her position, Steinberger notes that some courts outside Arizona have recognized a limited exception to the particularity rule for acts that are peculiarly within the knowledge of a corporate party. *See, e.g., Zatkin v. Primuth*, 551 F.Supp. 39, 42 (S.D.Cal.1982) (explaining that an exception to the particularity requirement may exist with respect to a corporate defendant).

¶ 77 We are not persuaded that we should apply such an exception here. Respondents are not alleged to comprise a single entity (such as a corporation) whose actions may be presumed to have been collectively assented to by its employees or members. Moreover, cases that have recognized this exception still require a complaint alleging *why* such information is peculiarly within a defendant's knowledge. *See Zatkin*, 551 F.Supp. at 42; *Silving*, 800 F.Supp.2d at 1075 ("[T]his exception does not nullify Rule 9(b); a plaintiff who makes allegations on information and belief must state the factual basis for the belief.") (quoting *Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir.1993) (emphasis omitted)). No such allegations are contained in Steinberger's complaint. We therefore decline to recognize this exception in this case.

¶ 78 Finally, to the extent Steinberger's complaint alleges that Respondents committed consumer fraud (Count Eight) during the origination of the loan in May 2005, we agree with the trial court that any such claim is barred by the statute of limita-

tions. A consumer fraud claim must be filed within one year after the cause of action accrues. *See Alaface v. Nat'l Inv. Co.*, 181 Ariz. 586, 591, 892 P.2d 1375, 1380 (App.1994) ("[A] consumer fraud action must be initiated within one year after the cause of action accrues."); *Murry v. Western Amer. Mortg. Co.*, 124 Ariz. 387, 390, 604 P.2d 651, 654 (App.1979) ("Since the Consumer Fraud Act creates a cause of action separate from common law fraud, an action commenced thereunder must be brought within one year as [it] requires"); *see also* A.R.S. § 12–541(5) (West 2013). Steinberger did not file her consumer fraud claim until November 2010 and, as a result, her consumer fraud claim was time-barred.

¶ 79 Thus, we affirm the dismissal of Steinberger's fraud-based claims (Counts Six, Seven and Eight).

### Count Ten: Unconscionability

¶ 80 Steinberger's unconscionability claim was dismissed because she failed to allege sufficient "facts supporting a claim for procedural unconscionability, and the terms of the Loan Documents [were] not substantively unconscionable."

### A. Procedural Unconscionability

¶ 81 Steinberger alleges that the circumstances under which her father entered into the loan were unconscionable. These allegations are based on her father's age (eighty-seven), the falsification of information about his income on his loan application, the alleged forgery of his initials next to certain contract terms, and the lack of explanation provided to him about important and unusual terms contained in the loan contract. Steinberger asserts the unconscionable terms consisted of the following: (1) a provision that payment of each monthly payment in full would result in an unpaid balance that grew, not diminished, based on the note's negative amortization, and (2) an interest rate that was listed at 1% on the loan documents, but could be adjusted every month starting with the first monthly payment.

¶ 82 "Procedural or process unconscionability is concerned with 'unfair sur-

prise,' fine print clauses, mistakes or ignorance of important facts or other things that mean bargaining did not proceed as it should." *Maxwell v. Fid. Fin. Servs. Inc.*, 184 Ariz. 82, 88–89, 907 P.2d 51, 57–58 (1995) (quoting Dan B. Dobbs, 2 Law of Remedies § 10.7, at 706 (2d ed.1993)). Courts consider the following types of factors when making this determination: the parties' "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible," and "whether there were alternative sources of supply for the goods in question." *Maxwell*, 184 Ariz. at 89, 907 P.2d at 58 (internal citation omitted).

¶ 83 Steinberger alleged a legally sufficient claim for procedural unconscionability. Steinberger alleged that her father was elderly (eighty-seven years old), the loan contract contained unusual terms that were not explained to her or her father, and that these unexplained terms caused unfair surprise. The complaint also alleges that Steinberger's father may have lacked the requisite mental capacity to enter into the loan, given the fact he suffered from dementia two years after the loan was executed.

¶ 84 Finally, Respondents contend that "all of the terms of the loan are apparent on the face of the note, which [Steinberger's] father signed." However, according to *Maxwell*, whether the terms of the loan are included in the loan is not the only relevant question. Procedural unconscionability also takes into consideration circumstances, such as those alleged here, where unexplained or unusual terms cause "unfair surprise" to a party entering the contract. *Maxwell*, 184 Ariz. at 88–89, 907 P.2d at 57–58 (quoting Dobbs, 2 Law of Remedies § 10.7 at 706).

### B. Substantive Unconscionability

¶ 85 When analyzing substantive unconscionability, we examine the relative fairness of the obligations assumed by the parties, including whether the "contract terms [are] so one-sided as to oppress or unfairly surprise an innocent party," whether there exists "an overall imbalance in the obligations and rights imposed by the bargain," and whether there is a "significant cost-price disparity." *Maxwell*, 184 Ariz. at 89, 907 P.2d at 58. Steinberger argues that the note is substantively unconscionable because (1) "not even one payment was to be made under the 1% interest rate listed in the Note[,]" (2) "Mr. Perkins and [Steinberger] did not understand that making the interest payment listed in the Note and disclosures would result in escalation of the principal balance *every single month*[,]" (3) "there was a cap on the principal escalation and once reached, the payment would skyrocket[,]" and (4) "no one explained any of this to them before putting that adhesion contract in front of Mr. Perkins to sign." (emphasis in original).

¶ 86 Respondents' argue that merely because one party to a loan contract is financially sophisticated does not mean that a contract is unconscionable. Respondents also argue that "the mere fact that the Promissory Note was an adjustable rate note, alone, is insufficient to render the loan unconscionable." However, Steinberger's claim for substantive unconscionability is not limited to allegations that Respondents are financially more sophisticated and that the loan involved an adjustable rate. As noted above, Steinberger alleges several terms in the loan which she contends are unusual, one-sided and oppressive.

¶ 87 Thus, we conclude that Steinberger has adequately pled a legally sufficient claim for substantive unconscionability, and we therefore vacate the trial court's dismissal of this claim.

### C. The Loan Modification Process

¶ 88 Steinberger also attempts to base her unconscionability claim on Respondents' conduct during the loan modification process. However, this conduct—which allegedly occurred years after the parties entered into the loan contract—cannot give rise to an unconscionability claim because unconscionability is "determined as of the time the parties entered into the contract." *Nelson v. Rice*, 198 Ariz. 563, 568, ¶ 14, 12 P.3d 238, 243 (App.2000).

¶ 89 Steinberger argues, however, that "[e]ach of the trial period modifications into which Respondents entered with [Steinberger] is an unconscionable contract arising out of the original unconscionable contract." We disagree. Steinberger's complaint does not allege that the modification negotiations resulted in the formation of any contract—oral or written. In truth, the complaint does not allege that Respondents ever actually agreed to modify the loan; instead, it alleges that Steinberger was approved for a trial-period of modified payments.

¶ 90 We note that the terms of the deed of trust appear to prohibit later oral agreements that contradict the terms of the original agreement unless the modifications are made in writing. The deed of trust provides that "Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing." The deed of trust appears to have contemplated that the parties or their successors might discuss modifications but provides that "[a]ny forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments … or in amounts less than due, shall not be a waiver of or preclude the exercise of any right or remedy." It also provides that "[e]xtension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower."

¶ 91 Accordingly, we affirm the dismissal of Steinberger's unconscionability claim insofar as it is based on the loan modification process.

### Count Eleven: Payment/Discharge of Debt

¶ 92 Steinberger's claim that her debt had already been discharged or paid was dismissed by the trial court based on Respondents' argument that "[p]laintiff's allegations are purely speculative and unsupported."

¶ 93 We affirm the dismissal of the parts of this claim insofar as it is based on the allegations that the debt was discharged due to the destruction of the note. It is true that A.R.S. § 47–3604(A)(1) provides that a person who is entitled to enforce an instrument "may discharge the obligation of a party to pay the instrument … [b]y an intentional voluntary act, such as surrender of the instrument to the party, destruction, mutilation or cancellation of the instrument, cancellation or striking out of the party's signature or the addition of words to the instrument indicating discharge." However, this section requires an "intentional voluntary act" that demonstrates that a party intended to forgive the debt or obligation represented by the instrument. *Id.* Accidental or unintentional mistakes in shredding such a document do not satisfy the "intentional voluntary" standard. *See G.E. Capital Mortg. Servs., Inc. v. Neely,* 135 N.C.App. 187, 191, 519 S.E.2d 553, 556 (N.C.Ct.App.1999) (analyzing the same section of the Uniform Commercial Code and explaining that a note secured by deed of trust was not extinguished when, due to a clerical error, the mortgagee mistakenly cancelled both the note and the deed of trust and surrendered them to mortgagors; mortgagee lacked necessary intent to discharge).

¶ 94 Absent from Steinberger's complaint is any allegation that Respondents intentionally destroyed the note or manifested an intent to renounce the loan; Steinberger simply alleges the note is not in Respondents' possession and that it was "destroyed" when it was scanned "at the time of loan initiation." Thus, the allegations in the complaint are insufficient to support this claim.

¶ 95 However, Count Eleven also alleges that part of the loan has already been paid by the FDIC under a "Shared–Loss Agreement," and Steinberger attached a copy of a Shared–Loss Agreement to the complaint. While it is not clear whether this agreement in fact applies to Steinberger's loan, the agreement does appear to provide that, in exchange for OneWest's assumption of IndyMac Federal's loans, the FDIC would reimburse OneWest at 80% for any default in payments on those loans. Steinberger alleges that this agreement, combined with insur-

ance coverage and/or other sources of reimbursement "has on information and belief resulted in OneWest's either being paid in full for the Note, or having received at least 80% of the payments due on the Note."

¶ 96 While the alleged insurance payments are indeed speculative and unsupported, the assertion that the FDIC has already reimbursed OneWest for Steinberger's default is not unsupported, based on the fact the Shared–Loss Agreement does appear to authorize such reimbursement. Under A.R.S. § 47–3602, "an instrument is paid to the extent payment is made by or on behalf of a party obliged to pay the instrument and to a person entitled to enforce the instrument." Thus, if it is true that the FDIC has already reimbursed OneWest for all or part of Steinberger's default, OneWest may not be entitled to recover that amount from Steinberger.

¶ 97 Given that Steinberger has adequately pled a claim for discharge based on the FDIC's alleged payment of all or part of her loan, we vacate the trial court's dismissal of this part of Steinberger's discharge/payment claim. However, we affirm the dismissal of the rest of this claim based on the alleged destruction of the note and any insurance payments.

### Attorneys' Fees

¶ 98 Steinberger seeks an award of her attorneys' fees and costs under Ariz. R.P. Spec. Act. Rule 4(g) and Rule 21(c). Respondents also seek an award of their costs under Rule 4(g), as well as A.R.S. § 12–342. In light of our rulings in this opinion, we conclude there is no clear prevailing party as yet, and therefore deny the attorneys' fees requests of both parties. However, because we vacate in part the trial court's dismissal of Steinberger's complaint, we award costs to Steinberger.

### Conclusion

¶ 99 For the foregoing reasons, we grant relief by vacating the dismissal of Steinberger's claim to vacate/void the notice of trustee's sale (Count One), breach of contract (Count Four), negligent performance of an undertaking (Count Five), negligence per se (Count Nine), and the allegations contained in Count Two. However, we deny relief and affirm the dismissal of Steinberger's claims for injunctive relief (Count Two), quiet title (Count Three), fraudulent concealment (Count Six), common law fraud (Count Seven), and consumer fraud (Count Eight). With respect to Steinberger's unconscionability claim (Count Ten), we vacate the trial court's dismissal of this claim, with the exception of Steinberger's unconscionability claim based on the loan modification process, which we conclude was properly dismissed. As to Steinberger's claim for payment/discharge (Count Eleven), we also vacate the trial court's dismissal, with the exception of Steinberger's claim based on the destruction of the note and insurance payments, which was properly dismissed. Finally, we remand for further proceedings consistent with this opinion.